UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ─────────────────────────────────────────x<br>JEFFREY MEAD KURZON,<br><br>         Plaintiff,<br><br>       vs.<br><br><br>DEMOCRATIC NATIONAL COMMITTEE<br>and<br>NEW YORK STATE DEMOCRATIC COMMITTEE,<br>         Defendants.<br>─────────────────────────────────────────x | Civil Action No.<br><br>COMPLAINT FOR<br>VIOLATION OF<br>RIGHT TO FREELY<br>ASSOCIATE and<br>BREACH OF<br>CONTRACT<br><br>**PRELIMINARY<br>INJUNCTION<br>REQUESTED** |

## NATURE OF THE ACTION

1.      This is an action based upon the right of every human being to freely associate.  "The most natural privilege of man, next to the right of acting for himself, is that of combining his [energy, ideas and dreams] with those of his fellow creatures and of acting in common with them."  DE TOCQUEVILLE, DEMOCRACY IN AMERICA 196 (1963). The desire to join with others to accomplish goals has been recognized for almost 150 years, as evidenced in the works of de Tocqueville.

2.      For more than three decades, courts have recognized a right to associate freely with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural objectives.  *See* Roberts v. United States Jaycees, 468 U.S. 609 (1984); Daniel v. Paul, 395 U.S. 298 (1969); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958); Douglas, The Right of Association, 63 COLUM. L. REV. 1361, 1361 (1963) ("The right of association is closely related to the right to believe as one chooses and to the right of privacy in those beliefs."). *See generally* The Civil Rights Cases, 109 U.S. 3, 59 (1883) (Harlan, J., dissenting) (Justice Harlan proclaimed that "[n]o government has ever brought, or ever can bring, its people into social intercourse against their wishes.").

## JURISDICTION AND VENUE

3.      Under 28 U.S.C. § 1331, the issues concerned in this case constitute federal questions under the United States Constitution and federal law. To wit, defendants have violated the rights

of plaintiff to freely associate with other members of his chosen political Party by establishing, and promoting, the "unpledged delegate" rule which directly violates the spirit, and language, of the rest of the Democratic National Committee Charter.

4. Plaintiff acknowledges, and appreciates, the right of political party's to establish their own rules. Plaintiff fully supports the right of the Democratic Party to govern its own activities.

5. However, as will be shown in the "Statement of Claim" section, the "unpledged delegate" rule violates the rights of its own members to freely associate as the rule is in contrast with the foundations upon which the Democratic Party was founded and the very reason why Plaintiff, who is similarly situated to millions of other members of the Democratic Party, joined the Party in the first place.

6. Defendants have acted under color of state action.

7. The delegate selection process of the New York State Democratic Party is coordinated utilizing public funds and the Democratic National Convention receives funding from the federal government.

8. The courts, pursuant to <u>Brentwood Academy v. Tennessee Secondary School Athletic Association</u>, 531 U.S. 288, 291 (2001) have consistently found a private organization's acts constitute state action when the organization performed a public function; was created, coerced, or encouraged by the government; or acted in a symbiotic relationship with the government.

9. Thus, Plaintiff's right to freely associate in this context is protected under the United States Constitution and the federal laws flowing from it, as well as the case law protecting such rights and, therefore, this lawsuit concerns a federal question and proper venue is laid in federal court.

10. Venue is properly laid in This Court as the injuries complained of occurred within its borders.

**PARTIES**

11. Plaintiff, Jeffrey Mead Kurzon (hereinafter "Mr. Kurzon"), graduated from McGill Law School in 2003. He is domiciled in New York County, New York. Mr. Kurzon began his legal career as a lawyer with Sidley Austin. Mr. Kurzon later went on to found his own law firm in New York City. As an attorney, he has championed the causes of indebted graduates of law schools which defrauded their students by manipulating data concerning their future career prospects and unpaid writers who had provided their services to one of the nation's largest media conglomerates. Mr. Kurzon has been a dedicated member of the Democratic Party. He began his involvement in New York City politics in 2007 when he raised over one-hundred-and-fifty-thousand-dollars ($150,000.00) for then-candidate Barack Obama and organized one of the earliest and largest grass roots groups in New York City in support of the candidate. In February 2013, Mr. Kurzon announced that he would be challenging Nydia Velazquez to represent the Democratic Party as its candidate to represent New York's seventh congressional district

("NYCD7").  He has registered scores of voters, including fellow Democrats and is currently a candidate to represent NYCD7 in the United States House of Representatives.  Mr. Kurzon has consistently refused to accept any PAC or lobbyist donations.

12.     Defendant, Democratic National Committee (hereinafter "DNC"), is the formal governing body for the United States Democratic Party.  The committee coordinates strategy to support Democratic Party candidates throughout the country for local, state, and national office.  It organizes the Democratic National Convention held every four years to nominate and confirm a candidate for president, and to formulate the party platform. While it provides support for party candidates, it does not have direct authority over elected officials.  The DNC has its principle office and headquarters in Washington, D.C.

13.     The DNC is composed of the chairs and vice-chairs of each state Democratic Party committee and over 200 members elected by Democrats in all 50 states and the territories. Its chairperson is elected by the committee. It conducts fundraising to support its activities.

14.     The DNC was established at the 1848 Democratic National Convention.  It is a self-governing organization that is governed by its charter (the "Charter") and by-laws.  The DNC Charter is the contract between the Democratic Party and the voters such as Mr. Kurzon who chose to freely associate with the Democratic Party.

15.     The Preamble of the DNC Charter shows that the guiding principle of the Party stands for the proposition that, "We, the Democrats of the United States of America, united in common purpose, hereby rededicate ourselves to the principles which have historically sustained our Party. Recognizing that the vitality of the Nation's political institutions has been the foundation of its enduring strength, we acknowledge that a political party which wishes to lead must listen to those it would lead, a party which asks for the people's trust must prove that it trusts the people and a party which hopes to call forth the best the Nation can achieve must embody the best of the Nation's heritage and traditions."  Thus, the DNC can be understood to be a political party which stands for the proposition that it is indeed the "Party of the people."

16.     Defendant, New York State Democratic Committee (hereinafter "NYSDC"), is the affiliate of the Democratic Party in the state of New York. Its headquarters are in Midtown Manhattan, New York City, and it has an office in Albany.  The web page of NYSDC promises that, "Democrats believe that we must restore the faith of the public in our government."

**SUBSTANTIVE ALLEGATIONS**

17.         The NYSDC delegate selection process is controlled by the "2016 Delegate Selection Plan of the New York State Democratic Committee" (hereinafter "NYS Plan").

18.     The DNC nomination process is controlled by the Delegate Selection Rules for the 2016 Democratic National Convention (hereinafter "National Rules"), the Call for the 2016 Democratic National Convention (hereinafter "Party Call"), and the Regulations of the Rules and By-Laws Committee of the Democratic National Committee (hereinafter "National Regulations").

19.     The NYS Plan provides, in pertinent part, that:


"1. Applicable Rules: The selection of delegates and alternates to the National Convention shall be governed by the Charter and By-Laws of the Democratic Party of the United States, the "Delegate Selection Rules for the 2016 Democratic National Convention ("National Rules"), the Call for the 2016 Democratic National Convention ("Party Call"), the Regulations of the Rules and By-Laws Committee of the Democratic National Committee ("National Regulations"), the State Party Rules, the New York State Election Law ("Election Law"), and this Plan.   2. Priority of Rules: If a conflict arises between this Plan and the National Rules, Party Call or National Regulations, the latter authorities shall govern. If a conflict arises between this Plan and the State Party Rules, this Plan shall govern."


20.     As the NYS Plan illustrates, the National Rules, Party Call and National Regulations are the supreme laws of the land concerning Democratic Party matters.

21.     The DNC Charter, and its accompanying By-laws, are further solidified as the supreme law of the land concerning DNC matters, as illustrated by language provided within "Appendix A" of the "2016 Call For the Democratic National Convention" which provides, in pertinent part that:

"Rules of Procedure of the Credentials Committee of the 2016 Democratic National Convention 2. Parties: 4. Each challenge shall include a statement indicating that each challenger subscribes to the substance, intent and principles of the Charter and Bylaws of the Democratic Party of the United States.  Each challenger must have been personally injured with respect to his or her participation in the delegate selection process by any violation complained of or shall be so situated that he or she clearly will be personally injured by such violation."

22.     The "Preamble" of the DNC Charter reads as follows:
"We, the Democrats of the United States of America, united in common purpose, hereby rededicate ourselves to the principles which have historically sustained our Party. Recognizing that the vitality of the Nation's political institutions has been the foundation of its enduring strength, we acknowledge that a political party which wishes to lead must listen to those it would lead, a party which asks for the people's trust must prove that it trusts the people and a party which hopes to call forth the best the Nation can achieve must embody the best of the Nation's heritage and traditions. What we seek for our Nation, we hope for all people: individual freedom in the framework of a just society, political freedom in the framework of meaningful participation by all citizens. Bound by the United States Constitution, aware that a party must be responsive to be worthy of responsibility, we pledge ourselves to open, honest endeavor and to the conduct of public affairs in a manner worthy of a society of free people. Under God, and for these ends and upon these principles, we do establish and adopt this Charter of the Democratic Party of the United States of America."

23.     Rule 13 of the Delegate Selection Rules reads, in pertinent part, as follows:

"Fair Reflection of Presidential Preferences
A. Delegates shall be allocated in a fashion that fairly reflects the expressed presidential preference or uncommitted status of the primary voters or, if there is no binding primary, the convention and/or caucus participants."

24.     Superdelegates are unpledged delegates in the Democratic Party made up of various big name party leaders, including members of the Democratic National Committee, Democratic members of Congress, Democratic governors, and so on as listed by Rule 9A of the 2016 Delegate Selection Rules posted by the DNC. Their unpledged status means that regardless of how the party members in their particular districts vote, they can vote for whomever they see fit, and because they make up 714 out of 4765 delegates, they represent almost fifteen percent of the total delegate count, and almost thirty percent of the 2382 delegates needed to secure the party nomination.

25.     The establishment of the superdelegates was incorporated into the Charter via the following language:

 "SECTION 4. The National Convention shall be composed of delegates equally divided between men and women. The delegates shall be chosen through processes which:

g. prohibit unpledged and uncommitted delegates, except delegates or alternates expressing an uncommitted preference shall be permitted to be elected at the district level, in which event, if such preference meets the applicable threshold and qualifies for at-large or similar delegates or alternates, such at-large or similar delegates or alternates shall be allocated to that uncommitted preference as if it were a presidential candidate."

h. **notwithstanding any provision to the contrary in this Section** [emphasis added]:   i. provide for all of the members of the Democratic National Committee to serve as unpledged delegates, ii.  permit unpledged delegates consisting of: 1) the President and Vice President of the United States, if Democrats, 2) the Democratic members of the United States Senate and the Democratic members of the House of Representatives, 3) the Democratic Governors, 4) former Democratic Presidents and Vice Presidents of the United States, 5) former Democratic Majority and Minority Leaders of the United States Senate, 6) former Democratic Speakers and Minority Leaders of the United States House of Representatives, 7) former Chairs of the Democratic National Committee, 8) such delegates shall not be permitted to have alternates and such delegates shall constitute an exception to Subsection (b) of this Section 4."

26.     As you will notice, the language "notwithstanding any provisions to the contrary in this Section" protects this provision from this specific Section, however it does not protect the "superdelegate" rule from the rest of the Charter, nor other rules, nor the spirit of which this rule is conflict with.

27.     The fact that the superdelegates represent fifteen percent (15%) of the total delegation runs contrary to the spirit, and language, of the rest of the DNC Charter as well as to other rules provided by the DNC itself.

28.     The Preamble of the DNC Charter shows that the guiding principle of the Party stands for the proposition that, "We, the Democrats of the United States of America, united in common purpose, hereby rededicate ourselves to the principles which have historically sustained our Party. Recognizing that the vitality of the Nation's political institutions has been the foundation of its enduring strength, we acknowledge that a political party which wishes to lead must listen to those it would lead, a party which asks for the people's trust must prove that it trusts the people and a party which hopes to call forth the best the Nation can achieve must embody the best of the Nation's heritage and traditions."

29.     The superdelegate rule is in stark contrast to Rule 13 of the Delegate Selection Rules which state, in pertinent part, as follows:

"Fair Reflection of Presidential Preferences

A.      Delegates shall be allocated in a fashion that fairly reflects the expressed presidential preference or uncommitted status of the primary voters or, if there is no binding primary, the convention and/or caucus participants."

30.     A full forty-four (44) delegates of the 291 total delegates (slightly more than 15%) awarded to the New York State delegation are free to support either candidate without being beholden to the overall vote of the average voters in the primary as was formalized during the NYSDC Convention on May 22, 2016 and May 23, 2016.  This occurs in the other states and jurisdictions where Democrats vote as well.

31.     The superdelegate rule is in conflict with the spirit, and specific language, of the DNC Charter.

32.     The superdelegate rule is simultaneously in conflict with other rules provided by the DNC.

33.     The intent of DNC leadership in further effectuating the superdelegate rule is apparent from the DNC Chairwoman who has stated that it is meant to ensure that Party leaders and elected officials don't have to be in a position where they are running against grassroots activists."

34.     Further harming Plaintiff's right to freely associate is the fact that the media have portrayed the Presidential campaign to be over owing to the fact that one candidate has gained the verbal support of five-hundred-and-forty-three superdelegates to merely forty-four.  That is a significant tipping of the scales when one considers that the superdelegates comprise fifteen-percent of the total delegation.  Thus, there is an understanding that the race is close to over despite the fact that the popular vote is evenly matched and the fact that there is merely a little more than a two-hundred-and-fifty delegate difference springing from the primary and caucus votes that have been thus far counted.

35.     "It has long been the rule that ambiguities in a contractual instrument will be resolved contra proferentem, against the party who prepared or presented it" Hence, a contract which is internally inconsistent in material respects or that reasonably lends itself to two conflicting

interpretations is subject to the rule invoking strict construction of the contract in the light most favorable to the nondrafting party." Natt v. White Sands Condominium 95 A.D.3d 848, 943 N.Y.S.2d 231 N.Y.A.D. 2 Dept.,2012. May 01, 2012.

## COUNT I

### VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS, INCLUDING THE FREEDOM TO ASSOCIATE

35.     Plaintiff repeats and realleges each and every allegation contained above.

36.     Defendants have violated Plaintiff's Constitutional rights.

37.     "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 -61 (1958).

38.     Acting under the color of state action, Defendants have violated the rights of Plaintiff to freely associate through its incorporation of the "superdelegate" rule and its further implementation of such rule.

## COUNT II

### BREACH OF CONTRACT

39.     Plaintiff repeats and realleges each and every allegation contained above.

40.     The Charter, and the accompanying By-laws, of the DNC, as well as the rules of the NYSDC, are the binding documents, and contracts, which control the activities of Defendants vis-à-vis their relations with the Plaintiff.  They embody the spirit of which Plaintiff was led to associate himself with other like-minded individuals in the political sphere.

41.     The "superdelegate" rule is in opposition to the spirit and plain text of these documents and therefore a breach of the contractual obligations entered into between Plaintiff and Defendants undertaken as a result of Plaintiff being a registered Democratic Party member.

## COUNT III

### SUPERDELEGATE RULE VIOLATES PLAINIFF'S RIGHT TO EQUAL PROTECTION UNDER THE 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION

42.     Plaintiff's right to equal protection, pursuant to the clause of the 14th amendment, is violated by the superdelegate rule as a result of the holding by the United States' "… having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore 531 U.S. 98 (2000)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment, as follows:

A.  A preliminary injunction prohibiting Defendants from effectuating any actions concerning the superdelegate rule pursuant to New York Civil Practice Law and Rules § 6301 which states, "A preliminary injunction may be granted in any action where it appears that the defendant threatens, or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff. A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had."  As explained in this Complaint, Defendants have completed their delegation selection plan, and will be seeking to seat their delegation within the larger DNC delegation within days.  The rights of plaintiff not to have his vote diminished through the seating of the superdelegates must be protected.  Thus, a hearing needs to be held forthwith in order to ensure these rights are protected;

B.      In order to comport with the principles guiding the Democratic Party, the remedy must achieve a proportional method of vote-counting.  Thus, the most efficient mechanism for solving

this problem would most probably be to computate the votes of the super-delegates so as to have an end result which respects the popular vote. Thereby, each super-delegate would be diluted to having either a half a vote or a quarter of a vote or whatever is necessary so that each candidate is granted the proper amount of votes as they have earned via the district votes;

C.    Awarding plaintiff rescission;

D.    Awarding Plaintiff such other and further relief as may be just and proper under the circumstances in law and equity.

Dated:  June 2, 2016

/s/ Joshua A. Douglass
Joshua A. Douglass (JD5674)
426 Old Route 22
Amenia, NY 12501
(845)504-7694
Attorney for Plaintiff
NYS Bar Registration  #4349759
jdouglassesq@gmail.com
